**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

——————————

No. 21-2472

——————————

CHARLES MACK,
Appellant

v.

JOHN YOST, Warden; TIM KUHN, Associate Warden;
JEFFREY STEPHENS, Trust Fund Officer;
SAMUEL VENSLOSKY, Correctional officer, sued in their
individual capacities; DOUG ROBERTS, Correctional
Officer, sued in their individual capacities

——————————

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 3-10-cv-00264)
District Judge:  Honorable Kim R. Gibson

——————————

Argued on
September 7, 2022

Before:  JORDAN, HARDIMAN, and SMITH, *Circuit
Judges*

(Filed: March 21, 2023)

_____

Sarah M. Czypinski
John M. Hagan
Jessica Moran   [ARGUED]
K&L Gates
210 Sixth Avenue
Pittsburgh, PA   15222
        *Counsel for Appellant*

Christopher E. Kemmitt
Michael Skocpol   [ARGUED]
NAACP Legal Defense & Educational Fund
700 14th Street, NW – Ste. 600
Washington, DC   20005

Adam Murphy
Samuel Spital
NAACP Legal Defense & Educational Fund
40 Rector Street – 5th FL.
New York, NY   10006

Samuel Weiss
Rights Behind Bars
416 Florida Avenue, NW - #26152
Washington, DC   20001
        *Counsel for Amicus Rights Behind Bars and*
        *NAACP Legal Defense & Education Fun*

Laura S. Irwin
Office of United States Attorney
700 Grant Street – Suite 4000
Pittsburgh, PA   15219

Courtney Dixon   [ARGUED]
United State Department of Justice
 Civil Division, Appellate Staff
950 Pennsylvania Avenue NW
Washington, DC   20530
     *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

"Among the most inestimable of our blessings," said Thomas Jefferson, is that "of liberty to worship our creator in the way we think most agreeable to his will … ."[1]   That bedrock principle, enshrined in the Free Exercise Clause of the First Amendment, has since been reinforced through federal laws that guarantee prisoners the freedom to practice their faiths.  Charles Mack, a former federal inmate and a devout Muslim, brought suit to vindicate that guarantee.

---

[1] Letter from Thomas Jefferson to John Thomas (Nov. 18, 1807), https://rotunda. upress.virginia.edu/founders/default.xqy?keys=FOEA-print-04-01-02-6807 (cleaned up).

When Mack was incarcerated, he worked at the prison commissary, where two supervising prison guards singled him out for harassment because of his Muslim faith. Most significantly, the evidence as it now stands shows that, when Mack would go to the back of the commissary to pray during shift breaks, the guards would follow him and deliberately interfere with his prayers by making noises, talking loudly, and kicking boxes. Fearing retaliation if he continued to pray at work, Mack eventually stopped doing so, but the guards nevertheless engineered his termination from his commissary job. He then sued.

The resulting case has been before us three times already, and, at this point, Mack's lone surviving claim arises under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* The guards sought summary judgment on that claim, but the District Court initially denied the motion, holding that a jury could reasonably find the guards had, in violation of RFRA, substantially burdened Mack's exercise of religion. The guards later moved for summary judgment again, this time on the theory that they are entitled to qualified immunity. On that argument, the District Court sided with them. It held that qualified immunity was warranted because no clearly established caselaw would have put a reasonable person on notice of the illegality of the guards' actions. Mack has again appealed.

We agree with Mack that granting summary judgment was wrong. While, as a matter of law, qualified immunity can be asserted as a defense under RFRA, the officers have not – at least on this record – met their burden of establishing that

4

defense. Framed in the light most favorable to Mack, evidence of the RFRA violation here involved significant, deliberate, repeated, and unjustified interference by prison officials with Mack's ability to pray as required by his faith. Based on those facts, which are undisputed for purposes of summary judgment, the officers are not entitled to qualified immunity. But if different facts come out at trial, the officers may again raise qualified immunity. Because affording the guards qualified immunity is unwarranted at this stage, we will vacate and remand for further proceedings.

## I.    BACKGROUND

### A.    Factual Background[2]

Mack is a practicing Muslim and a former inmate at the federal correctional institution in Loretto, Pennsylvania. During his incarceration, he worked as a paid employee in the prison's commissary between May and October 2009. He would stock the shelves and fill inmates' orders by collecting commissary items. Mack was supervised by two correctional

---

[2] The following facts are based primarily on Mack's deposition testimony. No one has pointed to any evidence, such as testimony, affidavits, video footage, or documents, that would disprove Mack's version of events. While, in the District Court, the guards "den[ied] that the events [Mack described in his testimony] actually occurred" (J.A. at 9) – again, without any supporting evidence – they now appear to concede the truthfulness of his testimony, at least for purposes of summary judgment.

officers, Douglas Roberts and Samuel Venslosky, who oversaw the commissary workers and handled sales.

Central to Mack's observance of his Muslim faith is his obligation to pray five times a day. Those five daily prayers, each of which takes approximately five minutes, are supposed to be done at prescribed times. An imam provided Mack and other Muslim inmates with a prayer schedule tailored to their location in western Pennsylvania so that they knew exactly when to pray each day. Although the imam advised Mack that it was acceptable to catch up on his prayers at the end of the day if he was unable to pray on schedule, he was nonetheless expected to adhere to the prescribed times whenever feasible. On Fridays, Mack was also supposed to attend, with other Muslim inmates, a special prayer service known as Jumu'ah. When he prayed, Mack typically used a prayer rug. He could, in accordance with his faith, pray from wherever he was located in the prison, so long as he faced east when doing so.[3]

Because of his religious commitments, Mack was afforded some accommodations while working at the commissary. He was excused from handling pork products[4]

---

[3] We understand Mack's testimony about facing east to be a reference to the requirement of Islam that prayers "be offered toward the Qiblah, which is the direction to the Kabah, the holy shrine in Mecca." *Sharp v. Johnson*, 669 F.3d 144, 147 n.3 (3d Cir. 2012).

[4] As noted earlier in this litigation, "practicing Muslims do not handle pork." *Mack v. Warden Loretto FCI* (*Mack II*), 839 F.3d 286, 291 (3d Cir. 2016); *see also Williams v. Bitner*, 455 F.3d 186, 194 (3d Cir. 2006) (holding prison officials were

and was allowed to leave work for the Jumu'ah prayer service. Although prison rules did not permit him to return to his cell to pray while on the job, those policies did not prohibit his praying at the commissary. Mack therefore prayed "[a]s much as [he] could" at work. (J.A. at 134-35.) He typically prayed in a back corner of the commissary where there was space for him to do so during shift breaks.

Most guards let Mack pray without incident. But, absent any written guidance from the prison on inmates' rights of worship, Mack perceived his ability to practice his faith as depending on the goodwill of the individual guards. The guards at Loretto were aware of his faith, both because he regularly wore a religious head covering known as a kufi and because the prison chaplain kept a list of all the inmates who were practicing Muslims. Mack tried to stay mindful of the guards' attitudes toward Islam and sought to avoid "inconveniencing" them. (J.A. at 125.) He believed that if one of them was hostile to his faith, and he crossed that guard by praying in front of him, "the negativity [was] going to come." (J.A. at 125, 129.) Were that to happen, Mack worried, it could result in the guard finding some reason to discipline him, even if no legitimate reason existed, and he could get put "[i]n the

---

not entitled to qualified immunity because it was clearly established that "prison officials must respect and accommodate, when practicable, a Muslim inmate's religious beliefs regarding prohibitions on the handling of pork"). We have acknowledged that restriction derives, at least in part, from the following statement in the Koran: "He has forbidden you ... the flesh of swine." *Bitner*, 455 F.3d at 187 (quoting The Koran, Part II, 70:173 n. 210).

7

hole" (i.e., in solitary confinement). (J.A. at 125, 163-64.) That fear of retaliation, Mack says, made him especially wary of giving the guards any basis to write him up.

The "negativity" that Mack foresaw became a reality when his job brought him into contact with Roberts and Venslosky. As he perceived it – and as other inmates told him – they were "out to get [him] because [he] was a Muslim," and they singled him out for disrespect and harassment accordingly. (J.A. at 206.) Although their actions were initially limited to some untoward "stares" and "looks," they began more "direct[ly]" confronting him as time went on. (J.A. at 204-05.)

That "direct" confrontation was, for a while, limited to "snide remarks" mocking Mack's adherence to Islam. (J.A. at 137.) For instance, Roberts repeatedly told Mack that he didn't like him and specified, "I don't like Muslims." (J.A. at 202-04.) Similarly, Venslosky told other inmates that he disliked Mack because he was Muslim. Venslosky also "sarcastically asked Mack whether Muslim was a religion [sic]." (J.A. at 293.) In early October of 2009, things went "downhill" when Roberts said to Mack: "There is no good Muslim but a dead Muslim." (J.A. at 159-161.) While Roberts was disparaging Mack, Venslosky would often sit back and grin, "egging him on" and expressing what Mack saw as tacit approval of Roberts's conduct. (J.A. at 173-74.)

Of primary significance here, and in addition to the verbal harassment, Roberts and Venslosky would interfere with Mack's efforts to pray during his commissary shifts. Mack sometimes delayed his prayers so that he could avoid any "foolishness" from them while he prayed. (J.A. at 136.) As he

8

viewed the situation, the two of them had "indicate[d] … that they [were] going to make this [situation as] difficult as possible because of [his] religion," so there was no use in exposing himself to further "abuse." (J.A. at 136.) Nevertheless, he did sometimes pray at work, and Roberts and Venslosky started coming back to the corner of the commissary when he did, even though they had "[n]o reason to be over there." (J.A. at 156-57.) They would "[i]nterrupt" Mack by making noises, telling jokes, speaking loudly, and even kicking the boxes that Mack was praying behind. (J.A. at 132-34, 156.) Mack was supposed to be "concentrating on praying," according to the tenets of his faith, but he could not do so because the officers "purposely" talked and made noises "just because they kn[e]w [he was]" there praying. (J.A. at 132.) His perception of the guards' behavior was backed up by other inmates who told him that Roberts and Venslosky "were trying to interrupt [his] prayers." (J.A. at 157-58.)

Further harassment occurred toward the end of Mack's time at the commissary. One Friday, as Mack left work for the Jumu'ah prayer service, Roberts surreptitiously put a sticker on Mack's back. It said "I love pork bacon." When Mack later confronted Roberts about the prank, Roberts did not dispute what he had done and told Mack, "You are not going to be here long," which Mack understood as a promise that he would lose his commissary job. (J.A. at 174.)

Around that time, Mack decided to stop praying at the commissary. He believed Roberts and Venslosky "didn't want to see" him praying, and, "after everything that was going on[,] only a fool would still try to be in their face and let[] them have any kind of ammunition to come at [him.]" (J.A. at 177-78.) Mack confided his predicament to an imam, who told him that

9

he "shouldn't even try to pray" at the commissary at the times required by his faith and should instead wait to catch up on his prayers after his shift had ended. (J.A. at 178-79.) Mack heeded that advice and ceased praying at the commissary altogether.

On October 21, 2009, less than two weeks after the sticker-on-the-back incident, Mack was fired from his commissary job. Venslosky, who carried out the termination, explained that Mack had violated the prohibition on bringing another inmate's shopping slip into the commissary, which was a fireable offense.[5] Mack denied the accusation and still does, which he describes as a "mere pretext" to justify his being fired "for seeking to practice the basic tenets of his Islamic faith through prayer while working in the commissary." (J.A. at 290.)

## B. Procedural Background

This is the fourth time this case has come to our Court. Mack's lawsuit began in October 2010, when he filed a pro se complaint against Roberts, Venslosky, and other Bureau of Prison employees, alleging what we later construed to be causes of action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for First and Eighth Amendment violations, as well as a claim under the Religious Land Use and Institutionalized Persons

---

[5] According to Mack, prison rules provide that an inmate may only submit his order at the commissary by handing in his slip when the commissary is open and operating. Giving a slip to a worker ahead of time is prohibited.

10

Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq. Mack v. Yost (Mack I)*, 427 F. App'x 70, 71 (3d Cir. 2011) (per curiam). The District Court screened the complaint and summarily dismissed it, but we reversed, holding that Mack had alleged enough to merit a chance to amend his complaint. *Id.* at 71-74.

Mack then filed an amended complaint, asserting what the District Court took to be First Amendment retaliation and Fifth Amendment Equal Protection claims under *Bivens* and a claim under RLUIPA. *Mack v. Yost*, 979 F. Supp. 2d 639, 646, 649 (W.D. Pa. 2013). The defendants moved to dismiss, and the Court granted their motion. *Id.* at 644, 652. As relevant here, the District Court ruled that federal prisoners asserting claims like Mack's could sue only under RFRA, not RLUIPA. *Id.* at 650. And under RFRA, the Court held, Mack failed to allege a substantial burden on his religious exercise since he was not "forced … to choose between following his religion and forfeiting benefits" or "pressured … to modify his religious behavior." *Id.* at 650-51. Similarly, even if the claim was construed as one under the Free Exercise Clause, the Court said, Mack's allegations were inadequate because he did not claim that the defendants "prevent[ed] [him] from exercising his religious beliefs" by, for instance, "den[ying] him the opportunity to pray." *Id.* at 651-52.

When Mack again appealed, we affirmed in part and vacated in part. *Mack v. Warden Loretto FCI (Mack II)*, 839 F.3d 286, 291 (3d Cir. 2016). We agreed with the dismissal of the Free Exercise and Equal Protection claims, but we revived the First Amendment retaliation claim, holding that such a *Bivens* claim was cognizable, adequately alleged, and, at the pleading stage, not barred by qualified immunity. *Id.* at 291,

11

295-301. We also vacated the dismissal of the RFRA claim, holding that Mack had sufficiently pled that the defendants' actions had substantially burdened his exercise of religion. *Id.* at 301, 304. We noted that a burden can be "substantial," triggering heightened scrutiny under RFRA, "even if it involves indirect coercion to betray one's religious beliefs." *Id.* (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). That standard was plausibly met, we held, by Mack's allegations that "Roberts' anti-Muslim harassment and … Venslosky's tacit approval created a hostile work environment" that put "indirect pressure … on Mack" "to stop praying at work." *Id.*

Back at the District Court, the remaining defendants – Venslosky, Roberts, and one other guard – moved for summary judgment on the two surviving claims, but the Court denied their motion. *See Mack v. Stevens*, 2018 WL 4375083, at *1 (W.D. Pa. Sept. 13, 2018). Relying on our analysis in *Mack II*, it held that a reasonable jury could side with Mack on his RFRA claim and find that the defendants' "anti-Muslim comments, conduct, and tacit approval created a hostile and harassing environment 'substantial' enough to dissuade Mack from practicing his religion by praying at work as he had prior to the harassment." *Id.* at *5-6. The Court also concluded that the defendants were not entitled to qualified immunity on the First Amendment retaliation claim. *Id.* at *8.

The defendants appealed the part of the District Court's order denying them qualified immunity on the retaliation claim, and we reversed. *Mack v. Yost (Mack III)*, 968 F.3d 311, 314, 318 (3d Cir. 2020). We held that the claim was no longer cognizable as a *Bivens* action in light of the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), which

12

narrowed the availability of such claims. *Id.* at 314, 325. That left intact, on remand, just one final piece of the case: the RFRA claim against Roberts and Venslosky.

Those two guards, the Defendants before us now, moved again for summary judgment on that claim, asserting – for the first time – that they are entitled to qualified immunity for their actions because they did not violate any clearly established rights.[6] This time, the District Court granted their motion. It first concluded that qualified immunity is a defense to a RFRA claim. Then, on the merits, the Court held that it was not clearly established in 2009, when the Defendants' conduct took place, that their harassing actions would violate RFRA. The Court observed that Mack had not cited any cases finding RFRA violations in factually similar circumstances, since the cases he offered all entailed a "direct, outright denial, or active limitation of a diet compelled by religious belief," rather than the "indirect, mostly verbal conduct" that caused Mack to "voluntarily cease exercising a tenet of his faith." (J.A. at 16.) By contrast, the Court considered the cases cited by the Defendants to be more analogous, cases in which

---

[6] The Defendants relied on qualified immunity throughout this litigation in seeking to defeat the First Amendment retaliation claim, but they waited until their first summary judgment motion to assert that defense against the RFRA claim. Even then, they claimed that they had not violated any right under RFRA but did not address the second prong of the analysis, which asks whether the right at issue is clearly established. Still, after *Mack III*, the District Court permitted them to again move for summary judgment, this time on whether they had violated any clearly established right.

13

"verbal harassment" was found to not substantially burden religious exercise.  (J.A. at 16.)  To the District Court, those cases showed there was no clearly established law prohibiting conduct like the Defendants'.

Mack has once again appealed.  The NAACP Legal Defense and Education Fund, Inc. and Rights Behind Bars ("Amici") filed an *amicus curiae* brief in support of Mack, and we granted them leave to present oral argument.  We appreciate their participation.

## II.    DISCUSSION[7]

### A.    A Qualified Immunity Defense Is Available Under RFRA

"[T]he judicially created doctrine of qualified immunity" shields governmental officials from suit and from liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Peroza-Benitez v. Smith*, 994 F.3d 157,

---

[7] The District Court had jurisdiction under 28 U.S.C. § 331.  We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review over matters of statutory interpretation.  *Fair Hous. Rights Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 213 (3d Cir. 2016).  "[W]e are bound, on the basis of our independent judgment, … to interpret statutory provisions and accord them the meaning that Congress intended," regardless of the parties' positions.  *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 615 n.13 (3d Cir. 2015) (cleaned up).

164-65 (3d Cir. 2021). Qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 164 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Mack challenges the District Court's grant of summary judgment to the Defendants on the basis of that doctrine. But before we consider his arguments, we first address the threshold question of whether a qualified immunity defense is even available in a suit brought under RFRA. We hold that it is.[8]

In interpreting RFRA, we begin, as with any statute, with the text. *Khan v. Att'y Gen.*, 979 F.3d 193, 197-98 (3d Cir. 2020). It states that the "[g]overnment shall not substantially burden a person's exercise of religion … [unless] it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling

---

[8] The Defendants argue that Mack has forfeited the issue of whether qualified immunity is available as a defense in a RFRA case by failing to squarely bring it before us. But, even if that were true, we must necessarily resolve that predicate question of statutory interpretation, using "our independent judgment," *id.*, before turning to the Defendants' invocation of immunity. *See Stramaski v. Lawley*, 44 F.4th 318, 326-27 (5th Cir. 2022) ("[R]egardless of whether the applicability of qualified immunity to [a statute] is a statutory-construction issue or whether it is simply too critical to ignore in this case, we will address it.").

15

governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). Anyone "whose religious exercise has been burdened in violation of [RFRA]" can sue to "obtain appropriate relief." *Id.* § 2000bb-1(c). There is no mention of qualified immunity. Rather, liability appears mandatory unless the defendant can show that the actions constituting the substantial burden are the least restrictive means of furthering a compelling government interest. And the open-ended phrase "appropriate relief" does not obviously hint at a qualified immunity defense.

But we do not interpret statutes in a vacuum, and Congress does not legislate in one. Rather, "Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." *Farina v. Nokia Inc.*, 625 F.3d 97, 112 (3d Cir. 2010). In the RFRA setting in particular, the authorization of "appropriate relief" is "inherently context dependent." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (quoting *Sossamon v. Texas*, 563 U.S. 277, 286 (2011)).

Congress passed RFRA in 1993, Pub. L. No. 103-141, § 2, 107 Stat. 1488, more than a century after it enacted the Civil Rights Act of 1871. The present-day version of the latter, 42 U.S.C. § 1983, permits suits against state government officials who deprive individuals of "any rights, privileges, or immunities secured by the Constitution and laws." Like RFRA, § 1983 "on its face admits of no immunities." *Malley v. Briggs*, 475 U.S. 335, 339 (1986). "By the time Congress enacted RFRA," however, the Supreme Court had interpreted § 1983 "to permit monetary recovery against officials" only if they "violated 'clearly established' federal law." *Tanzin*, 141 S. Ct. at 491.

16

Specifically, the Court had held that § 1983 did not abrogate certain well-established common-law immunities protecting government officials. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967); *cf. Malley*, 475 U.S. at 339 ("[W]e have read [§ 1983] 'in harmony with general principles of tort immunities and defenses rather than in derogation of them.'"). The Court understood the common law as of 1871 to provide most officials a qualified immunity from liability for their actions. *Buckley*, 509 U.S. at 268. Section 1983 did not abrogate such immunity, so, under the statute, an officer who violated an individual's federal rights could not be subject to liability for damages if those rights were not clearly established.[9] *Id.*; *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("[O]fficials sued for violations of rights conferred by a statute … become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages.").

---

[9] Although the Court found support in the common law for the existence of qualified immunity, *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993), the standard for immunity on which it ultimately settled – shielding officers from liability unless they violated clearly established rights of which an objectively reasonable person would have known – was "not at all embodied in the common law." *Anderson v. Creighton*, 483 U.S. 635, 645 (1987). Rather, the Court "completely reformulated qualified immunity" and steered the doctrine away from "the inquiry into [whether the officer acted with] subjective malice so frequently required at common law." *Id.*

17

And while § 1983 is the vehicle for claiming that state officials have violated federal constitutional or statutory rights, the Supreme Court has held that *Bivens* actions asserting implied causes of action against federal officials for constitutional violations are similarly subject to a qualified immunity defense. *Butz v. Economou*, 438 U.S. 478, 500-04 (1978). The Court found "no basis" for treating differently "federal officials … sued for a constitutional infringement as authorized by *Bivens*" and "state officials … sued for the identical violation under § 1983." *Id.* at 500.

So, to summarize: Congress enacted RFRA against a "legal backdrop," *Tanzin*, 141 S. Ct. at 490 (internal quotation marks omitted), in which state and federal officials sued for violating the Constitution, and state officials sued for violating federal law, could invoke qualified immunity as a defense. Indeed, qualified immunity "represent[ed] the norm" when it came to suits against public officials. *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). It is therefore appropriate to presume that Congress drafted RFRA mindful of and consistent with that status quo. *Cf. Farina*, 625 F.3d at 112 ("It is only natural that Congress would intend to incorporate into [the Class Action Fairness Act] the case law governing amended pleadings.").

That presumption is not absolute, as Congress can "override" the "background of common-law adjudicatory principles." *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 457 (2012) (internal quotation marks omitted). But here, there is good reason to think that Congress embraced and incorporated the doctrine of qualified immunity in enacting RFRA. The Supreme Court's decision in *Tanzin v. Tanvir* is instructive. 141 S. Ct. 486 (2020). The question presented in that case was

18

whether RFRA's authorization of "appropriate relief" "include[d] claims for money damages against Government officials in their individual capacities," and the Court answered in the affirmative. *Id*. at 489. It first held that RFRA, like § 1983, authorized individual-capacity suits against federal officers. *Id*. at 490. "Because RFRA uses the same terminology as § 1983 in the very same field of civil rights law, 'it is reasonable to believe that the terminology bears a consistent meaning,'" the Court reasoned. *Id.* at 490-91 (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012)). In deciding what relief was "appropriate" in such suits, the Court looked to the "availability of damages under § 1983" in suits against state and local government officials. *Id.* at 491-92. Since the statutes are sufficiently similar, "parties suing under RFRA must have at least the same avenues for relief against officials" that they had under § 1983, which included "a right to seek damages against Government employees." *Id.* at 492.

The Court did not directly address whether the right to damages under RFRA was subject to a qualified immunity defense. But, in a footnote, it observed with apparent approval that the parties had agreed "that government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA." *Id.* at 492 n.*. It then went on to highlight the government's position that the qualified immunity defense "was created for precisely these circumstances" – i.e., suits seeking money damages from officials sued in their individual capacities – and is "a 'powerful shield' that 'protects all but the plainly incompetent or those who flout clearly established law.'" *Id.* (internal citations omitted).

19

Although *Tanzin* did not say whether qualified immunity is available to RFRA defendants, the force of its logic makes the answer clear. Just as the textual similarity between § 1983 and RFRA means that those statutes provide analogous remedies, *id*. at 492, it stands to reason that they also contemplate analogous defenses. Qualified immunity limits a § 1983 plaintiff's ability to obtain damages, and since "Congress intended for courts to borrow concepts from § 1983 jurisprudence when construing RFRA," *Mack II*, 839 F.3d at 302, qualified immunity must also limit a RFRA plaintiff's ability to get damages. *See Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 814 (10th Cir. 2022) ("The very analysis [in *Tanzin*] that supported recognition of the damages claim also compels recognition of qualified immunity."). Underscoring that rationale, *Tanzin*'s conspicuously detailed and approving footnote reference to qualified immunity signals that application of the doctrine to RFRA claims is appropriate.

Even if we felt that there was some room for doubt after *Tanzin*, refusing to recognize a qualified immunity defense to RFRA claims would be inconsistent with precedent extending the defense to claims under a number of other statutes. The Supreme Court has relied on the doctrine when examining a claim under 42 U.S.C. § 1985(3), a Civil War Era remedial statute that prohibits conspiracies to deprive others of equal protection or equal privileges under the law. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1865-66 (2017). And "many circuits have applied qualified immunity to individual-capacity suits under a variety of statutes," *Ajaj*, 25 F.4th at 814, including the Family and Medical Leave Act, the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Racketeer Influenced and Corrupt Organizations Act, the Sherman Antitrust Act, the Fair Housing Act, and Title VI of the Civil

20

Rights Act of 1964. *Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 771 (5th Cir. 2015); *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1299-300, 1300 n.34 (11th Cir. 1998).[10] Our Amici claim that, because RFRA is focused on a specific subject matter, as opposed to § 1983's broader focus, using a judge-made doctrine to limit recovery would undermine its purpose. The same, however, could be said of the various statutes that courts have found to be subject to a qualified immunity defense, and yet those laws have been read to incorporate the doctrine.

But RFRA is special, say both Mack and our Amici. The statute was designed to protect religious liberty rights, and so, they argue, it would frustrate the statutory promise of protection if we recognize a qualified immunity defense that lets officers off the hook except when they violate clearly established law. Yet while the First Amendment's Free

---

[10] Amici direct us to a case refusing to apply qualified immunity to whistleblower retaliation suits under the False Claims Act ("FCA"), *Samuel v. Holmes*, 138 F.3d 173 (5th Cir. 1998). But the concern there was that, "given the goals of the FCA[]" to discourage fraud against the government and encourage those with knowledge of such fraud to disclose it, "[g]ranting government officials … qualified immunity would hardly spur reluctant employees to step forward." *Id.* at 178; *see also United States ex rel. Citynet, LLC v. Gianato*, 962 F.3d 154, 159 (4th Cir. 2020) (declining to recognize a qualified immunity defense under another FCA provision). The FCA's purposes take it far afield of RFRA, which, like § 1983, is a remedial statute designed to protect civil rights. Section 1983, then, provides the much better comparator.

Exercise Clause also serves as a bulwark against governmental intrusion on religious practice, there is "no doubt that damages claims have always been available under § 1983 for *clearly established* violations of the First Amendment." *Tanzin*, 141 S. Ct. at 492 (emphasis added). In other words, such relief is available only when defendants are not entitled to qualified immunity.

It is true that RFRA was enacted to guarantee more generous protections for religious freedom than are available under the Supreme Court's present interpretation of the First Amendment. A few years before passage of the statute, the Court in *Employment Division, Department of Human Resources of Oregon v. Smith* overruled prior caselaw and held that neutral and generally applicable laws, even if they incidentally burden religious exercise, pass muster under the First Amendment. 494 U.S. 872, 880-81, 883-86 & n.3 (1990); *cf. Yellowbear v. Lampert*, 741 F.3d 48, 52 (10th Cir. 2014) (Gorsuch, J.) (noting that pre-*Smith* caselaw "suggested that no law, not even a neutral law of general applicability," could substantially burden religious exercise unless that burden is the least restrictive means of achieving a compelling governmental interest). With RFRA, Congress revived the Court's pre-*Smith* precedents, prohibiting government officials from taking any action that substantially burdens religious exercise, "even if the burden results from a rule of general applicability," if the action is not the least restrictive means of furthering a compelling government interest.[11]   42 U.S.C. § 2000bb-1(a);

---

[11] RFRA actually "did more than merely restore the … [pre-*Smith*] line of cases; it provided even broader protection for religious liberty" by adding the "least restrictive means"

*see also id.* § 2000bb(a)(2) (finding that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise").

In short, RFRA placed individuals on essentially the same footing as they had been prior to *Smith* in terms of their rights against and remedies for governmental invasions of religious liberty. Those remedies, of course, included money damages under § 1983 and *Bivens*, subject to a qualified immunity defense. There is no reason to believe that the robust safeguards RFRA put in place to defend religious freedom effected a departure from the existing practice of allowing officers to invoke qualified immunity.

Our Amici emphasize that RFRA and its silence on the matter of qualified immunity is "modern," as compared with the long history of § 1983's silence. (Amici Br. at 16.) But RFRA's being of more recent vintage cuts against discarding qualified immunity, as that doctrine was firmly in place for other civil-rights actions when RFRA was enacted. *See Gonzalez*, 161 F.3d at 1299 n.31 (reasoning that a statute's "silen[ce] as to qualified immunity indicates that Congress did not intend to preclude the common-law qualified immunity defense" in suits under that statute). After all, if Congress had wanted to discard the doctrine, "we presume that [it] would have specifically so provided." *Buckley*, 509 U.S. at 268.

Finally, our Amici challenge the doctrinal justifications for affording officers qualified immunity, arguing that we

---

requirement. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 n.3 (2014).

should decline to expand the doctrine to a new context due to its lack of a sound basis in text, history, or practical considerations. True enough, the textual and policy-based underpinnings of qualified immunity have generated debate in recent years.[12] Reconsidering whether the doctrine should

---

[12] *Compare Baxter v. Bracey*, 140 S. Ct. 1862, 1862-64 (2020) (Thomas, J., dissenting from the denial of certiorari) (arguing that the Supreme Court's "§ 1983 qualified immunity doctrine appears to stray from the statutory text" and is not "grounded in the common-law backdrop against which Congress enacted the 1871 Act"); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (contending that the doctrine has been "transform[ed] … into an absolute shield for law enforcement officers"); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 45-46 (2018) (describing qualified immunity as "unlawful and inconsistent with conventional principles of statutory interpretation" and having "shoddy foundations"); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1799-800 (2018) (qualified immunity "fails to achieve its intended policy aims," "hamper[s] the development of constitutional law[,] and may send the message that officers can disregard the law without consequence"); *with* Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1337 (2021) (asserting that the common law in 1871 recognized a qualified immunity against suit absent evidence of "an officer's subjective improper purpose"); Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 Notre Dame L. Rev. 1853, 1874-75, 1882-85 (2018) (defending the doctrine on stare decisis grounds and arguing that it is effective in weeding out meritless suits); Hon. Andrew S. Oldham, Official

continue in its current form, however, is not within our purview. That decision lies with Congress, as wielder of the statute-drafting pen, and with the Supreme Court, as chief interpreter of Congress's handiwork. Unless and until either of those bodies changes the legal landscape, we must faithfully apply both the letter and spirit of binding precedent. *See Winslow v. F.E.R.C.*, 587 F.3d 1133, 1135 (D.C. Cir. 2009) (Kavanaugh, J.) ("Vertical stare decisis – both in letter and in spirit – is a critical aspect of our hierarchical Judiciary headed by 'one supreme Court.'"). In light of the Court's recognition in *Tanzin* of the similarities between RFRA and § 1983, and in the absence of any principled reason to treat RFRA differently from the other statutes that are subject to qualified immunity defenses, precedent and principles of statutory interpretation prompt us – as they have several of our sister circuits[13] – to

---

Immunity at the Founding 1, 22-27 (Apr. 19, 2021) (unpublished manuscript) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3824983) (suggesting that the original public meaning of the Fourth Amendment incorporated a form of qualified immunity as a constitutional matter).

[13] *See Ajaj v. Fed. Bureau of Prisons*, 25 F.4th 805, 817 (10th Cir. 2022) ("We conclude that qualified immunity can be invoked by officials sued for damages in their individual capacities under RFRA."); *accord Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1061 (9th Cir. 2020) (analyzing RFRA claim to see if "it was not clearly established" when the defendants' conduct took place that it would count as a "substantial religious burden"), *rev'd on other grounds*, 142 S. Ct. 1051 (2022); *Davila v. Gladen*, 777 F.3d 1198, 1210-11 (11th Cir. 2015) (similar); *Lebron v. Rumsfeld*, 670 F.3d 540,

accept qualified immunity as a limit on the scope of relief under RFRA.

### B.   The Defendants Are Not Entitled To Qualified Immunity At This Stage[14]

We turn next to the core question on appeal: whether the District Court correctly granted the Defendants qualified immunity on the grounds that they did not violate clearly established rights.  Based on the record before us, we conclude it was error to deem the Defendants immune at this stage of the

560 (4th Cir. 2012) (similar); *see also Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) (per curiam) (holding, in the alternative, that the defendants "are entitled to qualified immunity against plaintiffs' RFRA claim").

[14] We exercise plenary review over a district court's grant of summary judgment based on qualified immunity. *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).  Similarly, we review de novo "the legal grounds underpinning a claim of qualified immunity." *Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view the evidence in the light most favorable to the non-moving party and "give that party the benefit of all reasonable inferences that can be drawn from the evidence."  *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014); *see also Bitner*, 455 F.3d at 187 n.1   ("Because we are reviewing a claim of qualified immunity, we view the factual allegations in the light most favorable to the party claiming injury." (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001))).

case. The grant of summary judgment in their favor thus cannot stand.

Our inquiry is guided by the two-prong test for qualified immunity, the first prong being whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right, and the second being whether that right was clearly established. *Peroza-Benitez*, 994 F.3d at 165. "[T]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion on both prongs at summary judgment. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).

### 1. Mack's Rights Were Violated

It is undisputed that the first prong – a violation of Mack's RFRA rights – has been established here. To establish a prima facie case under RFRA, Mack needed to show "that the government (1) substantially burdened (2) a sincere (3) religious exercise." *Mack II*, 839 F.3d at 304. Here, there is no question that Mack sincerely adheres to his faith, and that his prayers at the commissary constituted religious exercise. RFRA defines "exercise of religion" to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *See* 42 U.S.C. § 2000bb-2(4) (incorporating RLUIPA's definition for "religious exercise," 42 U.S.C. § 2000cc-5(7), as the definition of "exercise of religion" for RFRA). Thus, Mack's prayers are no less religious exercise because he heeded his imam's advice and ceased praying at the commissary altogether after Roberts and Venslosky escalated their campaign of harassment against him. *See Holt v. Hobbs*, 574 U.S. 352, 355-56, 362 (2015) (explaining it was error to treat "the burden on petitioner's religious exercise," i.e., a prison policy prohibiting him from

27

growing a half-inch beard, as "slight" because "his religion would 'credit' him for attempting to follow his religious beliefs, even if that attempt proved to be unsuccessful" because RLUIPA "applies to an exercise of religion regardless of whether it is 'compelled'").

As for the substantial burden element of the prima facie case, we held it was satisfied at the motion-to-dismiss stage, as Mack plausibly alleged that Roberts and Venslosky had placed "indirect pressure … on [him]" "to stop praying at work" by creating a "hostile work environment" that drove him to "betray [his] religious beliefs." *Mack II*, 839 F.3d at 304. And the District Court found "[t]he same conclusion … warranted" on the basis of the factual record at summary judgment, concluding that a reasonable jury could find that the Defendants had "'substantially burdened' Mack's religious exercise by pressuring him into altering his prayer rituals." *Mack*, 2018 WL 4375083, at *5.

The Defendants nowhere argue that the District Court got that wrong. It thus became incumbent upon them to show that their actions were the least restrictive means of furthering a compelling government interest. *Small v. Lehman*, 98 F.3d 762, 767 (3d Cir. 1996), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997); *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013). They have not even attempted to do that. Accordingly, we see no reason to disturb the District Court's conclusion that the Defendants unlawfully infringed Mack's religious liberty. For our purposes, then, we proceed with the understanding that a violation of RFRA occurred, although we reiterate that this conclusion is made solely for the purpose of reviewing the summary judgment ruling now on

28

appeal and is based on viewing in the light most favorable to Mack the record as it now stands.

## 2. Mack's Rights Were Clearly Established

Because the Defendants have failed on the first prong of the qualified immunity analysis, they are only entitled to summary judgment if they can bear the burden of showing, on the second prong, that reasonable officers could not have known that their actions violated clearly established law. *Halsey*, 750 F.3d at 288. In analyzing the "clearly established law" prong, we proceed in two steps: we first "define the right allegedly violated at the appropriate level of specificity" and then "ask whether that right was 'clearly established' at the time of its alleged violation." *Jefferson*, 21 F.4th at 81.

### a. *The Right as Properly Defined*

It is essential to begin by "fram[ing] the right 'in light of the specific context of the case,'" with all reasonable inferences drawn in the nonmovant's favor. *Peroza-Benitez*, 994 F.3d at 165-66; *accord Tolan v. Cotton*, 572 U.S. 650, 657 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even … [on] the clearly-established prong of the standard."). The Supreme Court has repeatedly cautioned that the qualified immunity inquiry demands a "high 'degree of specificity'" and that courts may not "define clearly established law at a high level of generality," which would "avoid[] the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

29

Mack misses the mark when he frames the relevant right as a freedom from "restrictions on or hindrances to central religious practices" or "direct or indirect governmental action" that burdens his religious practices. (Opening Br. at 13, 24; *accord* Mack Supp. Ltr. at 3 ("[I]t is clearly established that a defendant cannot substantially burden a prisoner's religious practices – either directly or indirectly – without justification.").) That is far too broad and generic a statement. *See HIRA Educ. Servs. N. Am. v. Augustine*, 991 F.3d 180, 191 (3d Cir. 2021) (finding inadequately specific, for qualified immunity analysis on First Amendment and RLUIPA claims, "the general constitutional rule that government officials cannot interfere with the free exercise of religion"). Indeed, it is hard to imagine *any* RFRA violation – which necessarily requires that government "substantially burden" the exercise of religion, 42 U.S.C. § 2000bb-1(a) – that would not involve a "restriction on" or "hindrance[] to" religious exercise achieved through either "direct or indirect" government action.

But the Defendants also fail to correctly frame the right. Their framing is, in a sense, too narrow, as it ignores the present factual and procedural realities of the case. Taking their cue from our decision in *Mack II*, they assert that the right at issue is freedom from a "hostile work environment" – one consisting of "mostly verbal" "anti-Muslim harassment" – that "indirect[ly]" causes an inmate to "refrain from praying during his prison work assignment." (Answering Br. at 7, 12-13, 18 (quoting *Mack II*, 839 F.3d at 304).) *Mack II*, however, was decided at the pleading stage, based on a liberal construction of Mack's pro se amended complaint. 839 F.3d at 293-94. Our discussion of Mack's allegations focused on Roberts slapping an "I LOVE BACON" sticker on Mack's back and later saying

30

to him, "there is no good Muslim, except a dead Muslim!" *Id.* at 291-92.

The record is different now, and so is the procedural posture. We are reviewing the District Court's ruling at summary judgment, with the benefit of a developed factual record, including, in particular, Mack's deposition testimony. That testimony, taken at face value, reveals that in addition to the harassment we identified from Mack's allegations, the Defendants actively and intentionally interfered with Mack's ability to practice his Muslim faith. Mack spoke about the importance of praying five times a day at set times, which he tried to do by praying "[a]s much as [he] could" while on shift breaks at the commissary. (J.A. at 134-35.) He also described how Roberts and Venslosky would come to the back corner of the commissary and make noises, tell jokes, speak loudly, and kick boxes around, "[i]nterrupt[ing]" the focus Mack was trying to achieve while he prayed. (J.A. at 132-34.) Those disruptions, Mack testified, were a purposeful part of an overall campaign by the officers to get him to stop praying at the commissary. And that campaign, according to Mack, led him to first delay his prayers and then to cease praying altogether at the times required by his faith. He instead tried to catch up on his prayers at the end of the day.

In light of that deposition testimony, we conclude that the District Court erred in how it framed the relevant right in its "clearly established law" analysis. The Court largely sided with the Defendants' view and looked to see whether the unlawfulness of their "mostly verbal" anti-Muslim harassment and hostility was clearly established. (J.A. at 16.) But a better characterization of the RFRA violation – one that more appropriately reflects "the specific context of the case," as

31

viewed in the light most favorable to Mack, *Peroza-Benitez*, 994 F.3d at 165-66 – is that the Defendants violated Mack's right to engage in prayer free of substantial, deliberate, repeated, and unjustified disruption by prison officials. That understanding of the right tracks Mack's portrayal of the harm he experienced, and it takes account of the Defendants' failure to tie their behavior to any legitimate penological interest, let alone a compelling one as required by RFRA.[15] (Opening Br.

---

[15] Our dissenting colleague agrees with the Defendants' and the District Court's more narrow framing of the constitutional right at issue, but even the Defendants acknowledge that Mack "attempts to characterize the conduct in this case as involving … a 'persistent' and 'malicious' 'campaign' to stop [him] from praying." (Answering Br. at 18.) And the Defendants do not argue that such framing is too general. Indeed, they make no effort to show that their conduct did not clearly violate RFRA or other analogous free exercise jurisprudence. Instead, they refuse to engage with that framing because they say it is either foreclosed by *Mack II*'s discussion of Mack's pro se allegations or by the record before us now. But we have now rejected both of those bases. *See* supra at Section II.B.1.

The Dissent also argues that our framing of the right is too general and abstract and, further, that we fail to account for the fact that Mack ceased praying voluntarily and did so believing that cessation would not violate his faith. We must respectfully disagree. To say that a prison official may not, without legitimate justification, engage in a substantial, deliberate, and repeated effort to interfere with an inmate's prayer is not to indulge in an abstraction. It is certainly not akin to defining the right in an excessive force case by saying simply that "objective reasonableness" is the touchstone for

32

Fourth Amendment claims, *Graham v. Connor*, 490 U.S. 386, 388 (1989), or reciting the broad statements of *Tennessee v. Garner*, 471 U.S. 1 (1985), regarding the use of deadly force. But even if our framing could be construed as closer to that end of the generality spectrum, the Supreme Court made it plain in *Brosseau v. Haugen* that, in the Fourth Amendment context, "[o]f course, in an obvious case, the[] standards [of *Graham* and *Garner*] can 'clearly establish' the answer, even without a body of relevant case law." 543 U.S. 194, 199 (2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)). Such an obvious case confronts us now.

Neither *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8-9 (2021) (per curiam), nor *White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam), changes the obviousness inquiry. Indeed, the Supreme Court in *Rivas-Villegas* specifically reaffirmed the point we have just set out, citing *Brosseau*. *See Rivas-Villegas*, 142 S. Ct. at 8 (explaining that, though "*Graham*'s and *Garner*'s standards are cast 'at a high level of generality[,]'" *Brosseau*, 543 U.S. at 199, '[i]n an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law"). The Court concluded only that the encounter at issue in *Rivas-Villegas* did not present an obvious case. *Id*. *White* likewise reaffirmed *Brosseau* but, again, found the situation confronted by the officer in question to be a non-obvious case. *See White*, 580 U.S. at 74, 80 (reaffirming its "h[o]ld[ing] that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case'" (quoting *Brosseau*, 543 U.S. at 199)).

Turning to the suggestion that Mack's supposedly voluntary cessation of prayer changes the calculus here, we again part ways with our dissenting colleague. As noted earlier, RFRA defines the "exercise of religion" to cover more

at 6, 15, 17-18, 21 (asserting that the Defendants "repeatedly" and "intentionally" waged a "campaign to force Mack to stop praying," which included "intrud[ing] into" and "interrupt[ing]" Mack's prayers, using intimidation, along with harassing statements and actions, which "served no conceivable penological purpose").)

If the District Court felt constrained by our description of Mack's allegations at the motion-to-dismiss stage, it should not have. Usually, the law of the case doctrine dictates that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Farina*, 625 F.3d at 117 n.21. But that doctrine does not prevent a court from deciding a summary judgment motion based on record evidence in a way that differs from previous decisions that were based on allegations in the complaint. *See Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329-30 (3d Cir. 2016) (rejecting a contrary argument as a "critical misapplication of the fundamental distinction between a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56"). Our analysis of Mack's complaint was not the law of the case for the District Court when it considered the record at summary judgment, nor is it

---

than what one's faith compels him to do. *See* Section II.B.1. More importantly, on the facts as we must take them, Mack stopped praying not because he wanted to but because the Defendants successfully campaigned to make him stop. That he did stop praying at the commissary does not end the matter, as the Dissent suggests. It *is* the matter. It is the whole point. We must confront whether such a campaign was clearly unlawful when the Defendants waged it.

34

the law of the case for us now.[16] We are therefore free to, and do, conclude that the relevant right here is the right to pray free of substantial, deliberate, repeated, and unjustified disruption by prison officials.

## b. *Clearly Established Violation of the Right*

Finally, we must decide if the right, as properly framed, is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Peroza-Benitez*, 994 F.3d at 165 (internal quotation marks omitted). That is "an objective (albeit fact-specific) question, where an officer's subjective beliefs are irrelevant." *Id.* (cleaned up).[17]

---

[16] For the same reason, Mack is wrong to say that the entire question of qualified immunity is resolved by *Mack II*. And in any event, we said nothing there about qualified immunity as it relates to Mack's RFRA claim, since the issue had not been raised. So even if *Mack II* constrained our analysis, the law of the case doctrine still would not settle the qualified immunity issue. *See Africa v. City of Philadelphia*, 158 F.3d 711, 718 (3d Cir. 1998) ("The law of the case doctrine… preclude[s] review of only those legal issues that the court in a prior appeal actually decided.").

[17] We note an important distinction here: whether a reasonable officer "would understand that what he is doing violates [a clearly established] right" is an objective test, *Peroza-Benitez*, 994 F.3d at 165, but that does not mean that only constitutional violations lacking a subjective element can become clearly prohibited by established law. While it is "simply irrelevant" whether the government officials "in fact knew that they were violating plaintiffs' constitutional rights,"

35

A right is clearly established if there is either "closely analogous" caselaw establishing that a defendant's conduct was unlawful or "evidence that the Defendant's conduct was

---

we have explained that, "in evaluating a defense of qualified immunity, an inquiry into the defendant's state of mind is proper where such state of mind is an essential element of the underlying civil rights claim." *Grant v. City of Pittsburgh*, 98 F.3d 116, 123, 125 (3d Cir. 1996). Indeed, on a number of occasions we have analyzed clearly established rights involving a subjective state-of-mind element. *See, e.g.*, *Dennis v. City of Philadelphia*, 19 F.4th 279, 290 (3d Cir. 2021) ("We conclude that the constitutional rule that framing criminal defendants through use of fabricated evidence, including false or perjured testimony, violates their constitutional rights applies with such obvious clarity that it is unreasonable for us to conclude anything other than that the detectives were on sufficient notice that their fabrication of evidence violated clearly established law."); *Kedra v. Schroeter*, 876 F.3d 424, 444 (3d Cir. 2017) (finding in connection with the shooting of police officer by his instructor during firearms training that "the allegations in [the] complaint are more than sufficient to state a claim for a state-created danger based on actual knowledge of a substantial risk of serious harm – the subjective theory of deliberate indifference that was then-clearly established"); *Halsey*, 750 F.3d at 296 ("The Supreme Court established decades before the original investigation in this case that the Constitution forbids prosecutors from knowingly using perjured testimony to secure a criminal conviction."). Hence, our inclusion of the word "deliberate" in the framing of the right at issue here is not inconsistent with an objective test for whether a right is clearly established.

so patently violative of the … right that reasonable officials would know [it to be a violation] without guidance from a court." *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011). We take a "broad view" of what makes a right clearly established, which can be satisfied "even without a precise factual correspondence between the case at issue and a previous case." *Peroza-Benitez*, 994 F.3d at 166 (internal quotation marks omitted). It is enough that "existing precedent … placed the statutory … question beyond debate."[18] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *accord Williams v. Bitner*, 455 F.3d 186, 192 (3d Cir. 2006) ("[I]f the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of

---

[18] We make no distinction here between cases applying RFRA and those relying on RLUIPA, since "the two statutes are analogous for purposes of the substantial burden test." *Mack II*, 839 F.3d at 304 n.103. RFRA originally applied to both the federal government and the states, but the Supreme Court later held the law unconstitutional as applied to the states. *City of Boerne v. Flores*, 521 U.S. 507, 532-36 (1997). Congress responded by passing RLUIPA, which "impose[d] the same general test as RFRA" on state prison practices and zoning regulations. *Hobby Lobby Stores, Inc.*, 573 U.S. at 695; 42 U.S.C. §§ 2000cc, 2000cc-1. For similar reasons, we look to First Amendment Free Exercise cases, particularly those decided before *Smith*. RFRA "reinstat[ed] … the pre-*Smith* substantive protections of the First Amendment," *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020), and the issue on which RFRA and post-*Smith* First Amendment jurisprudence have diverged – the legality of neutral and generally applicable rules that burden religion – is not implicated here.

the law, it is not necessary that there be binding precedent from this circuit so advising.").

Mack directs our attention to a handful of cases to show that his RFRA rights were clearly established, but none are particularly pertinent. They primarily involve "failure[s] to accommodate" an inmate's religion by refusing to grant requested dietary modifications. (Opening Br. at 22-23.) In one sense, Mack has underplayed his hand. There can be legitimate penological reasons for granting some but not all of an inmate's requests for what to serve at dinner. *See Williams v. Morton,* 343 F.3d 212, 216-21 (3d Cir. 2003) (First Amendment was not violated by affording Muslim inmates vegetarian meals, which are permitted by their faith, but not meals with halal meat). But the unrebutted evidence at this juncture shows that the Defendants were deliberately trying to disrupt Mack's prayers and so to pressure him to give up a central practice of his faith; no justification for that bigoted behavior has even been attempted.

Also inapposite is Mack's citation to an unreported district court case, *Pineda-Morales v. De Rosa*, in which an inmate was barred from engaging in more than a single prayer service of the type his faith required. *Pineda-Morales v. De Rosa*, 2005 WL 1607276, at *1, *11 (D.N.J. July 6, 2005). The court there held that the abridgment of the plaintiff's ability to pray established a colorable RFRA violation. *Id.* at *12. The RFRA violation in *Pineda-Morales*, however, was of a different type than the one here. The Defendants in the present case pressured Mack to stop praying by disturbing his daily prayers, as well as harassing and mocking him for his faith; they did not enact an outright prohibition on the type of prayer in which he sought to engage.

38

Having considered the cases Mack cites, we cannot say they include "factually analogous" binding precedent, or amount to a "robust consensus" of persuasive authority, that conduct like the Defendants' was unlawful. *Peroza-Benitez*, 994 F.3d at 165. Nevertheless, the facts do present a violation of RFRA that appears "so obvious," even in the absence of closely analogous precedent, "that every objectively reasonable government official facing the circumstances would know that the [Defendants'] conduct … violate[d] federal law when [they] acted." *Schneyder*, 653 F.3d at 330 (internal quotation marks omitted). In a case like this, "broad principle[s] of law" suffice to give fair warning to a reasonable officer that the conduct at issue is illegal. *Id.* "A public official," after all, "does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case." *Peroza-Benitez*, 994 F.3d at 166.

We are convinced that it should be clear to any reasonable correctional officer that, in the absence of some legitimate penological interest, he may not seek to prevent an inmate from praying in accordance with his faith. Under RFRA, an officer may not "put[] substantial pressure on an adherent [of a religious faith] to substantially modify his behavior and to violate his beliefs." *Mack II*, 839 F.3d at 304. Whether pressure is substantial turns on "*the intensity of the coercion* applied by the government to act contrary to [one's] beliefs." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Both direct and indirect burdening of religion are prohibited. *Washington v. Klem*, 497

39

F.3d 272, 279 (3d Cir. 2007) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981)).

Any deliberate interference with prayer is suspect, given the crucial role that prayer – in one form or another – plays in so many religious faiths. "Prayer unquestionably constitutes the 'exercise' of religion." *Sause v. Bauer*, 138 S. Ct. 2561, 2562 (2018). The guarantee of free exercise of religion encompasses "not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). Such acts unquestionably include a person "praying quietly" "briefly and by himself." *Id*. at 2422. The freedom to pray is in fact integral to the free-exercise jurisprudence that RFRA absorbed. *See Engel v. Vitale*, 370 U.S. 421, 434-35 (1962) (noting that among the founders were men who had "faith in the power of prayer," and "led the fight for adoption of" the First Amendment to try to "put an end to governmental control of religion and of prayer"); *cf. United States v. Ballard*, 322 U.S. 78, 87 (1944) (Under the Constitution, "[m]an's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views.").

"[G]overnment actions intentionally discriminating against religious exercise … serve no legitimate purpose." *Brown v. Borough of Mahaffey, Pa.*, 35 F.3d 846, 850 (3d Cir. 1994). Not surprisingly, "cases which address acts … which target religious activity" are "rare." *Id*. at 849; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

520, 523 (1993) ("The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions."). In other words, an intentional effort "to suppress … religious worship" for that purpose alone is plainly impermissible, *Lukumi*, 508 U.S. at 540, and worship plainly includes prayer.[19]  That prohibition on suppressing prayer does not stop at the jailhouse doors. *See Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) ("[R]easonable op[p]ortunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First … Amendment without fear of penalty."); *Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir. 1970) ("[C]ourts have not hesitated to intervene where prison officials have unreasonably attempted to curtail the practice of religion by prison inmates.").

The long-standing history and force of those general principles lead us to conclude that, during the time at issue, it was clearly established that a correctional officer was

---

[19] Of course, officers do not violate RFRA if their actions are the least restrictive means of furthering a compelling government interest.  42 U.S.C. § 2000bb-1(b). Additionally, in some circumstances, under the First Amendment, the government need only show a lesser "legitimate" interest to justify intrusions on free exercise. *E.g.*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 344-45, 349-50 (1987) (prison officials may not interfere with inmate prayer unless their actions are "reasonably related to legitimate penological interests").  But no matter the circumstance, the government must have *some* proper justification for interfering with an inmate's prayer.

forbidden to pressure an inmate to forego engaging in prayer, absent justification by a compelling government interest. While offering no justification whatsoever for their actions, the Defendants resist that conclusion. They instead argue that the caselaw at the time of their actions was too unsettled to clearly establish a violation. But their argument is based on the erroneous presumption that their preferred framing of the facts and inferences must be accepted. They cite a number of cases in which district courts held that threats or harassment toward inmates did not substantially burden religion. *E.g.*, *Brown v. Department of Corr. Pa.*, 2007 WL 4322980, at *15 (W.D. Pa. Aug. 29, 2007) (concluding officer's "alleged mere verbal threat" that he would put inmate in administrative custody if he persisted in his religious practices did not impose a substantial burden), *aff'd*, 265 F. App'x 107 (3d Cir. 2008).[20] Analogizing

---

[20] *See also Madison v. Kilbourne*, 2006 WL 2037572, at *4 (W.D. Va. July 18, 2006) ("allegations that certain officers taunted [an inmate] and ate his meals in front of him also fail to state any claim" under the First Amendment or RLUIPA), *vacated in part on other grounds*, 228 F. App'x 293 (4th Cir. 2007); *Mallory v. Winchester*, 2006 WL 3714838, at *2 (N.D. Ind. Dec. 12, 2006) (concluding that officers' "rude and hateful comments about Islam and [prisoner's] practice of it" were "unprofessional and irreverent" but did "not violate either the First Amendment or RLUIPA"); *Rouse v. Caruso*, 2007 WL 209922, at *6 (E.D. Mich. Jan. 24, 2007) (no RLUIPA claim against officer who "disparaged [plaintiff's] religious beliefs" and "harassed him based on his religious beliefs," because "[m]ere verbal harassment does not embody the type of coercive pressure which amounts to a substantial burden on religious exercise").

to those cases, however, misconstrues the RFRA violation at issue here. As previously discussed, Mack was not merely mocked or harassed. He says that Roberts and Venslosky also deliberately and repeatedly disrupted his attempts to complete his daily prayers, and he stopped praying at the times required by his faith.[21] The cases the Defendants cite may show a lack

_____

[21] We, again, reject the Dissent's assertion that the unlawfulness of the Defendants' conduct "does not follow immediately" from the legal propositions we have just discussed. (Dissent at 4 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).) The Defendants specifically acknowledge that pre-RFRA case law is properly considered in determining whether their conduct violates the clearly established religious exercise law that RFRA absorbed. More than 35 years ago the Supreme Court made clear that prison officials may not interfere with inmate prayer unless their actions are "reasonably related to legitimate penological interests[.]" *O'Lone*, 482 U.S. at 344-45, 349-50. Simply put, there is no logical conundrum about whether the law permits prison officials to wage a concerted campaign, for no legitimate reason, to stop an inmate from praying. That has been placed beyond reasonable debate for decades. RFRA allows a compelling government interest to justify impingement on religious exercise, but that does the Defendants no good, as they offer no explanation whatsoever for their actions. Indeed, animosity towards Muslims is the only basis for the officers' behavior discernible on the record before us, which is patently not a legitimate governmental interest, penological or otherwise. And the Defendants do not contend it is.

The Dissent also argues that the Defendants were not put on notice that the conduct they engaged in rose to the level

of settled law as to whether disparaging remarks alone are actionable, but they shed no light on the RFRA analysis as to deliberate interference with prayer.

---

of a substantial burden.  As an initial matter, none of the parties contend that the Defendants' conduct is not a substantial burden on Mack's rights.  We held Mack's pro se allegations satisfied the standard for a substantial burden at the motion to dismiss stage.  *Mack II*, 839 F.3d at 304.  The District Court reached the "same conclusion" based on the summary judgment record, *see Mack v. Stevens*, 2018 WL 4375083, at *5 (W.D. Pa. Sept. 13, 2018), and, as we have explained, the Defendants do not contend the District Court got that wrong.  *See supra* at Section II.B.1.  Given the facts as we must take them at this stage of the proceedings, we cannot accept the notion that there was anything unclear about whether the Defendants could lawfully pursue a prolonged campaign to prevent Mack from praying.  The Defendants have made no effort to show qualified immunity is appropriate on the present facts and, so, have not discharged their burden.

Viewed in the light most favorable to Mack, the facts are that the Defendants actually meant for their actions to be a substantial burden on Mack's prayers.  They wanted him to stop, and he did.  Of course, their subjective intent does not create the substantial burden.  Contrary to the Dissent's suggestion, that is not why we raise the point.  The extent of the burden imposed is relevant to whether we are dealing with a close case.  That the Defendants set out to prevent worship and accomplished that end is evidence of the extent of the burden, particularly when, at the summary judgment stage, we must view the evidence in the light most favorable to Mack.

The Defendants also assert that there is a "wide gap" between their actions and those in the cases that have been found to be "obvious" violations of law. (Answering Br. at 18-19 (citing *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (per curiam) (inmate left in a sewage-filled cell for six days); and *Hope v. Pelzer*, 536 U.S. 730, 734-35, 741 (2002) (prisoner handcuffed to hitching post, without a shirt, under the sun for seven hours, with scant water or bathroom breaks)).) It is self-evident, of course, that Mack's experiences – bad as they were – do not rise to the level of cruelty displayed in Eighth Amendment cases, in which the nature of the violation itself involves "cruel and unusual punishment." U.S. CONST. amend. VIII. Similarly, obviousness is often asserted in Fourth Amendment cases involving the use of excessive force. *E.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (applying obviousness standard to analyze excessive force claim); *see also El v. City of Pittsburgh*, 975 F.3d 327, 341 (3d Cir. 2020) ("We have concluded that cases [of excessive force] are obvious, and that general standards clearly establish a right, in extreme situations such as when lethal force is used or when a high school teacher sexually harassed and assaulted students." (citations omitted)).

RFRA violations, meanwhile, are based on substantial burdens on religion, which typically do not entail the brutality and physical abuse on display in the worst Fourth Amendment and Eighth Amendment cases. So, it may well be that an "obvious" RFRA violation will involve less viscerally abhorrent conduct than an infringement on some other constitutional right. But that misses the point. The question is whether "broad rules and general principles" make the existence of the right "so manifest that it is clearly established." *Schneyder*, 653 F.3d at 330. That in turn may depend on

45

whether the violation is obvious when judged against the particular standards applicable to the issue under examination. And the fact that there have been "few violations" of religious liberty involving the "rare" targeting of an individual based on his religious practices, *Lukumi*, 508 U.S. at 523; *Brown*, 35 F.3d at 849-50, indicates that the illegality of such conduct is generally obvious enough to be understood even without judicial guidance.[22]  *Cf. Safford Unified Sch. Dist. No. 1 v.*

---

[22] The Dissent expresses two additional concerns about our obviousness analysis that warrant a response.  First, our colleague observes that we "cite[] not a single case where courts have found RFRA or Free Exercise violations sufficiently 'obvious' to overcome qualified immunity." (Dissent at 5.)  He does not, however, argue that the rules of qualified immunity are different for RFRA and Free Exercise claims than for other kinds of claims.  It is well-settled that an obvious case is just that and, consequently, needs no prior precedent to justify the conclusion that follows.  We do not understand our colleague to be saying that some critical mass of earlier obvious violations of a particular federal right must be found in the case law before an obvious violation of that right can be recognized and condemned.  Were that so, of course, there could be no obvious cases.  Moreover, it would be odd to expect much binding precedent about obvious RFRA violations, since the Supreme Court has only recently recognized that RFRA allows for litigants "to obtain money damages against federal officials in their individual capacities," *Tanzin v. Tanvir*, 141 S. Ct. 486, 493 (2020), and we are only now, in this opinion, holding that RFRA allows for qualified immunity.  In addition, as to free exercise rights more generally, the most obvious cases will rarely arise because it is mercifully rare that government officials so brazenly seek to

46

*Redding*, 557 U.S. 364, 377 (2009) ("The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason … that '[t]he easiest cases don't even arise.'" (alteration in original) (quoting *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J.))).

Our conclusion that it was clearly established, at the time of the Defendants' actions, that there was a right to pray free of substantial, deliberate, repeated, and unjustified

suppress worship and prayer. So we are not the least surprised that examples of obvious violations of religious exercise rights are in short supply, and we hope that remains the case.

Second, our dissenting colleague observes that, as reprehensible as the Defendants' behavior may have been, it does not "show the 'extreme circumstances' or 'particularly egregious facts' indicative of the obvious case." (Dissent at 5 (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (per curiam).) Having already discussed the qualified immunity standard at length, including what is required for a finding of obviousness, it should be sufficient to note that the Supreme Court did not say that egregiousness is a requirement for a finding of obviousness or that the obviousness standard had changed because of *Taylor*. *Taylor* stands for the unsurprising conclusion that leaving an inmate in a sewage-filled cell for six days violates the Eighth Amendment. *Taylor*, 141 S. Ct. at 53-54. To say that an obvious case is also an egregious one is not to say that only egregious cases present obvious violations. And, while being denied the right to pray may not seem an egregious deprivation to everyone, for those who are devout it may be very egregious indeed. A wound need not be physical to be serious.

disruption by prison officials leads us to vacate the grant of summary judgment. But it does not foreclose the Defendants' qualified immunity defense from being raised at trial, since the Defendants have only conceded Mack's version of events for purposes of pressing their summary judgment motion. *See Reedy v. Evanson*, 615 F.3d 197, 224 n.38 (3d Cir. 2010) ("Our decision on qualified immunity … is solely that it is not warranted at the summary judgment stage in this case. Qualified immunity remains a viable defense, though its applicability cannot be finally determined until after the facts have been sorted out at trial."). The Defendants may still seek qualified immunity at trial, based on the facts proven then.

## III.    CONCLUSION

For the foregoing reasons, we will vacate the District Court's grant of summary judgment and remand for further proceedings consistent with this opinion.

HARDIMAN, *Circuit Judge*, dissenting.

The Supreme Court has repeatedly admonished courts not to define rights too broadly when determining whether law was "clearly established" for purposes of qualified immunity. In all but the rare case, the Court has also required factually analogous precedent that would render the violation beyond debate. Because those imperatives require us to affirm the judgment of the District Court, I respectfully dissent.

I

I agree with my colleagues on many points. Though a qualified immunity defense is available under the Religious Freedom Restoration Act (RFRA), we should not "disturb the District Court's conclusion that the Defendants unlawfully infringed Mack's religious liberty." Maj. Op. 28. Mack's prayers are certainly religious exercise. Maj. Op. 27. And Mack's definition of the right Defendants violated is "far too broad and generic" for qualified immunity purposes. Maj. Op. 30.

I disagree with my colleagues that Defendants and the District Court framed the right too narrowly. The Supreme Court's demanding standard requires the right to be defined with "a high degree of specificity." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (cleaned up). Even more importantly for Mack's appeal, it also requires the right to be tailored to "the specific context of the case." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Mack described Defendants' disruptions of his prayer while he worked at the prison commissary as making "noises

1

and jokes," engaging in "loud talking," and "kicking boxes" around. App. 132, 156. He also testified he could "always make [his] prayer up at the end of the day," which "still [was] consistent with [his] religion," App. 124, and with his imam's advice. App. 178–79. Relying on Mack's version of events, the District Court properly defined the right with specificity as the right to be free from "indirect, mostly verbal, conduct that causes a person to voluntarily cease exercising a tenet of his faith." *Mack v. Stevens*, 2021 WL 2982060, at \*5 (W.D. Pa. July 15, 2021). This framing hews closely to Mack's deposition testimony, though it appropriately diverges from Mack's briefing on appeal. *See* Maj. Op. 32 n.15.

The right articulated in the majority opinion—"the right to pray free of substantial, deliberate, repeated, and unjustified disruption by prison officials"—is too general. Maj. Op. 35. It omits two important facts from Mack's testimony: (1) he voluntarily ceased praying at work; and (2) he believed doing so was consistent with his religious obligations. Without these facts, the right is not tailored to the "specific context" of Mack's case. *Tolan*, 572 U.S. at 657 (cleaned up); *see also Kemp v. Liebel*, 877 F.3d 346, 352 (7th Cir. 2017) (finding "the right of prisoners not to have their religious practices interfered with and prevented absent a legitimate penological basis" too broad). The majority opinion concedes as much when it states that its generalized right suffices because this is an obvious case. Maj. Op. 32–33 n.15. For reasons I explain below, it is not.

## II

Even accepting the majority's articulation of the right at issue, I would not find it clearly established here. The majority claims we "take a 'broad view' of what makes a right clearly

2

established, which can be satisfied 'even without a precise factual correspondence between the case at issue and a previous case.'" Maj. Op. 37 (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 166 (3d Cir. 2021)). Although the Supreme Court recognizes there need not be "a case directly on point," it still requires the right to "have a sufficiently clear foundation in then-existing precedent" such that it is "settled law." *Wesby*, 138 S. Ct. at 589–90 (cleaned up). And "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590. This is an extremely high bar. Following our decision in *Peroza-Benitez*, the Supreme Court reemphasized that, absent the obvious case, a lack of sufficient factual similarity entitles an officer to qualified immunity. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8–9 (2021) (per curiam).

The cases Mack cites, as the majority notes, are not factually analogous. And the majority identifies no other precedent—from our Court or elsewhere, before or after RFRA was enacted—sufficiently similar to deny Defendants qualified immunity. So "this case presents a unique set of facts and circumstances," which "alone" provides "an important indication . . . that [Defendants'] conduct did not violate a 'clearly established' right." *White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam) (cleaned up).

The majority sidesteps the absence of on point caselaw by deeming the RFRA violation "so obvious" that every objectively reasonable officer would know that Defendants' conduct violated federal law. Maj. Op. 39 (quoting *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011). I agree with my colleagues that the obvious case does not demand factually analogous precedent, but it still requires that the law be "sufficiently clear" such that "every reasonable official would

3

understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (cleaned up). The majority identifies general RFRA and Free Exercise principles—that an official may not put substantial pressure on an individual to substantially modify his behavior and violate his religious beliefs, that both direct and indirect burdens on religion are prohibited, and so on—as evidence that Defendants violated clearly established law. Maj. Op. 39–41. But the unlawfulness of Defendants' conduct in this case "does not follow immediately" from these legal propositions. *Wesby*, 138 S. Ct. at 590 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). As the majority points out, whether pressure is "substantial" turns on the "intensity of the coercion applied," Maj. Op. 39, which is a fact-intensive inquiry. *See Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004) (explaining whether government action imposes a substantial burden on religious exercise is a "case-by-case, fact-specific inquiry"). While every reasonable officer would know that purposefully disrupting an inmate's ability to pray is wrong, he would not know whether the level of disruption here imposed a *substantial* burden on religion. So this case is not the "rare" obvious one. *Wesby*, 138 S. Ct. at 590.

That Defendants acted out of anti-Muslim animus and "actually meant for their actions to be a substantial burden on Mack's prayers," Maj. Op. 44 n.21, doesn't show that they violated clearly established law, either. Defendants cannot impose a "substantial burden" under RFRA merely by willing it—"whether a burden is substantial under RFRA is a question of law." *Real Alts., Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 (3d Cir. 2017) (cleaned up). And while an inquiry into a defendant's subjective state of mind may be appropriate "where such state of mind is an essential element of the underlying civil rights claim," Maj. Op. 36 n.17, the

4

RFRA substantial burden inquiry is "objective." *Real Alts., Inc.*, 867 F.3d at 356.

The majority opinion cites not a single case where courts have found RFRA or Free Exercise violations sufficiently "obvious" to overcome qualified immunity. My colleagues claim it "would be odd to expect much binding precedent about obvious RFRA violations" because the Supreme Court only recently recognized a cause of action under RFRA for damages against officials in their individual capacity. Maj. Op. 46 n.22. But damages "have always been available under § 1983 for clearly established violations of the First Amendment." *Tanzin v. Tanvir*, 141 S. Ct. 486, 492 (2020). And the majority relies on pre-RFRA Free Exercise caselaw to argue that the violation here was clearly established. Maj. Op. 43 n.21. So while no "critical mass of earlier obvious violations" is required, Maj. Op. 46 n.22, the absence of *any* obvious religious exercise violations suggests we should hesitate to find one here.

Finally, the majority dismisses the stark differences between this appeal and other "obvious" cases by positing that obvious RFRA violations will "involve less viscerally abhorrent conduct" than infringement of other constitutional rights. Maj. Op. 45. But even accepting that proposition, Mack's case still does not clear the obviousness hurdle. Mack failed to show the "extreme circumstances" or "particularly egregious facts" indicative of the obvious case. *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam). That reality does not excuse Defendants' reprehensible behavior. It means only that, as of 2009, it was not "obvious" that disrupting Mack's prayers in the prison workplace by making loud noises and jokes substantially burdened his religion.

\*     \*     \*

5

For the reasons stated, I would affirm the District Court's summary judgment for Defendants on qualified immunity grounds.