**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 21-2963, 21-2964 & 21-3018
_____

SHERELLE THOMAS, Administrator of the Estate of
Terelle Thomas; T. T., a minor, individually, as child of
decedent Terelle Thomas and as his sole survivor

v.

CITY OF HARRISBURG; OFFICER DARIL FOOSE;
OFFICER SCOTT JOHNSEN; OFFICER ADRIENNE
SALAZAR; TRAVIS BANNING; OFFICER BRIAN
CARRIERE; HARRISBURG CITY POLICE DEPT JOHN
DOE POLICE OFFICERS 1-5; DAUPHIN COUNTY
ADULT PROBATION JOHN DOE SUPERVISORY
OFFICERS 1-5; DAUPHIN COUNTY PRISON JOHN DOE
PRISON OFFICIALS 1-5; DAN KINSINGER; DAUPHIN
COUNTY; PRIMECARE MEDICAL INC; PRIMECARE
JOHN DOES MEDICAL EMPLOYEES 1-5,

Appellants

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1-20-cv-01178)
District Judge: Honorable Yvette Kane

Argued on January 11, 2023

Before: JORDAN, PHIPPS and ROTH, <u>Circuit Judges</u>

(Opinion filed December 6, 2023)

Sheryl L. Brown                    (ARGUED)
Siana Law
941 Pottstown Pike
Suite 200
Chester Springs, PA 19425

       Counsel for Appellants Officer Daril Foose,
       Officer Brian Carriere


Frederick B. Buck                  (ARGUED)
Rawle & Henderson
1500 Market Street
19th Floor, Centre Square West
Philadelphia, PA 19102

       Counsel for Appellants Officer Scott Johnsen,
       Officer Adrienne Salazar and Travis Banning

Kimberly A. Boyer-Cohen          (ARGUED)
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street
Suite 2300
Philadelphia, PA 19103

          Counsel for Appellant Dan Kinsinger


Kevin V. Mincey
Riley H. Ross, III               (ARGUED)
Mincey Fitzpatrick Ross
1650 Market Street
36th Floor
Philadelphia, PA 19103

          Counsel for Appellees

---

O P I N I O N

---

ROTH, Circuit Judge:

Sherelle Thomas[1] sued the City of Harrisburg; PrimeCare Medical, Inc.; and several individual law enforcement officers (the Officers) on behalf of her decedent

---

[1] The plaintiffs are Sherelle Thomas as the Administrator of the Estate of Terelle Thomas and Terelle Thomas's minor child. For convenience, we will speak of the plaintiffs/appellees in the singular as Sherelle Thomas.

3

relative, alleging that defendants failed both to render medical care and to intervene to prevent a violation of the right to medical care. The Officers moved to dismiss on grounds of qualified immunity. The District Court denied the motion. The court rejected the Officers' claims of qualified immunity because it found that Sherelle Thomas alleged sufficient facts to state her claims and both rights were clearly established at the time of the violations. The Officers appealed, limited to the issue of qualified immunity. Because the District Court correctly denied the Officers' claim of qualified immunity regarding their failure to render medical care claim, we will affirm on that issue. We conclude, however, that the District Court ruled incorrectly when it recognized a claim of failure to intervene. Because neither our Court nor the Supreme Court have recognized the right to intervene in the context of the rendering of medical care, qualified immunity for the Officers on this claim is appropriate and we will remand this claim to the District Court with instructions to dismiss it as to the Officers.

## I. BACKGROUND

### A. Factual Background

Sherelle Thomas, Administrator of the Estate of Terelle Thomas, alleged the following: On December 14, 2019, Harrisburg Police Officer Daril Foose was partnered with Adult Probation Officer Dan Kinsinger. At approximately 6:15 p.m., Foose observed Terrelle Thomas (Thomas) and another man walk from a bar and enter a vehicle as passengers. Foose followed the vehicle and made a traffic stop. Foose then noted that Thomas "spoke to her as if he had 'cotton mouth'

4

and a large amount of an unknown item inside his mouth."[2] She also observed "strands in his mouth that were almost like gum and paste," that his lips were "pasty white," and that his "face was covered with a white powdery substance."[3] She believed that Thomas had ingested something and was concealing it in his mouth.[4] As a result, Probation Officer Kinsinger detained Thomas, during which time Thomas "spit out a white liquid."[5] Officer Foose then concluded that Thomas had "ingested a large amount of cocaine."[6] However, Thomas told Officer Foose "that the only drugs on his person was a small amount of marijuana and that his lips were white because he had consumed a candy cigarette."[7] Officer Foose quickly concluded this was a lie because she "observed cocaine rocks fall out of . . . Thomas's shirt . . . and she failed to find any candy cigarettes."[8]

During Thomas's detention, four additional officers (Corporal Scott Johnsen and Officers Adrienne Salazar, Travis Banning, and Brian Carriere) arrived at the scene. Probation

---

[2] Appx. 071.

[3] Appx. 071.

[4] *See* Appx. 102 (Officer Foose stated that Thomas spit out "a white liquid that resembled crack cocaine attempted (sic) to be swallowed" and that "Thomas's mouth indicted (sic) to me that he had ingested a large amount of cocaine.").

[5] Appx. 071.

[6] Appx. 071.

[7] Appx. 072.

[8] Appx. 072. The Officers found additional crack cocaine rocks in the car where he had been sitting, as well as a digital scale with cocaine residue on it and a clear plastic baggie with marijuana inside it.

Officer Kinsinger and Officer Foose informed each officer that they believed that Thomas had ingested cocaine. Officer Salazar independently arrived at the same conclusion after observing a white powdery substance covering Thomas's lips, and informed Thomas that ingesting cocaine could have an "ill effect" on Thomas's health.[9] Corporal Johnsen "acknowledged the seriousness of ingesting cocaine by warning . . . Thomas that he could possibly die from ingesting drugs."[10] Officer Banning also observed a "large amount of white residue around and on . . . Thomas' lips," and did not find any evidence of candy cigarettes.[11] Based on their observations, the Officers filed police reports indicating Thomas's cocaine ingestion, and Officer Foose prepared and signed an Affidavit of Probable Cause noting that she had observed Thomas consume "crack cocaine in order to conceal it from police."[12]

The Officers jointly determined that Thomas should be transferred to Dauphin County Booking Center at the Dauphin County Prison for detention and processing. Dauphin County contracts with PrimeCare to provide limited medical care to individuals at Dauphin County Prison. PrimeCare does not have hospital features such as x-ray or CT machines but instead transfers individuals to a nearby hospital for testing and treatment. In addition, Harrisburg Police Department policy dictates that officers take arrestees to the hospital if the arrestees have "consumed illegal narcotics in a way that could

---

[9] Appx. 072–73.
[10] Appx. 072.
[11] Appx. 073.
[12] Appx. 115.

jeopardize their health and welfare."[13]  Despite this policy and the observations noted above, the Officers did not take Thomas to the hospital.  Instead, Officer Carriere arrested Thomas and transported him to Dauphin County Booking Center.  En route, Thomas told Officer Carriere that he was hot despite an outdoor temperature of 46 degrees.[14]  Officer Carriere opened the window.

Upon arrival at the Dauphin County Booking Center, Officer Carriere informed prison officials and medical staff there that Thomas "may have swallowed crack cocaine."[15]  The officials and PrimeCare staff noted that Thomas had white powder covering his lips, but they also failed to send Thomas to a hospital.  Instead, the officials placed Thomas in a cell without any medical care or observation.  Less than two hours after Thomas's arrest, surveillance video showed Thomas falling backwards onto the floor, hitting his head, and suffering cardiac arrest.  Only then did officials transport Thomas to UPMC Pinnacle Harrisburg Hospital, where he died three days later.  His cause of death was "cocaine and fentanyl toxicity."[16]

## B.  Procedural History

Sherelle Thomas sued numerous parties after her relative's death.  Several defendants moved to dismiss the Complaint, and the District Court granted the motions.

---

[13] Appx. 075.

[14] Thomas also alerted Officer Carriere of his seizure disorder.

[15] Appx. 078.

[16] Appx. 079.  Officer Foose was advised that medical personnel "sucked 40 ml of cocaine out of Thomas enroute to the hospital that he had ingested."  Appx. 103.

Sherelle Thomas then filed an Amended Complaint. The Amended Complaint asserted various state and federal claims against several defendants, including the Officers. Only Count IV (Fourteenth Amendment; Failure to Render Medical Care) and Count I (Fourteenth Amendment; Failure to Intervene) are relevant to this appeal.

The Amended Complaint drew six motions to dismiss and one motion for judgment on the pleadings and three other motions, each of which the District Court denied in full.[17] As relevant to this appeal, the District Court found that the Officers were not entitled to qualified immunity on the failure to intervene and failure to render medical care claims because the rights are clearly established, and the Amended Complaint states facts sufficient to allege that the Officers violated these rights. Officers Johnsen, Salazar, Banning, Foose, and Carriere, and Probation Officer Kinsinger filed a collateral appeal, limited to the issue of qualified immunity.

## II. JURISDICTION

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Sherelle Thomas moved to dismiss this appeal for lack of appellate jurisdiction. We will deny the motion because "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final

---

[17] During the pendency of the motions, Sherelle Thomas requested to voluntarily dismiss the City of Harrisburg from the suit. As a result, the District Court dismissed the claims against the City of Harrisburg with prejudice.

judgment."[18]  Accordingly, we have jurisdiction under § 1291.

## III.  DISCUSSION

The Officers contend that they are entitled to qualified immunity on the failure to render medical care and failure to intervene claims.  We review a district court's denial of a motion to dismiss on qualified immunity grounds de novo "as it involves a pure question of law."[19]  In doing so, we must accept Sherelle Thomas's allegations as true and draw all inferences in her favor.[20]

At the motion to dismiss stage, federal and state officials are entitled to qualified immunity unless (1) the "facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation,"[21] and (2) the alleged right was clearly established at the time of the violation.[22]  Because Sherelle Thomas alleged a violation of the constitutional right to

---

[18] *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  *See also Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) ("[A] district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291."); *Dennis v. City of Philadelphia*, 19 F.4th 279, 285 (3d Cir. 2021) (holding that the denial of a motion to dismiss based on qualified immunity can be a reviewable collateral order).

[19] *Dennis*, 19 F.4th at 284 (quoting *James v. City of Wilkes–Barre*, 700 F.3d 675, 679 (3d Cir. 2012)).

[20] *Id.* (citing *George v. Rehiel*, 738 F.3d 562, 571 (3d Cir. 2013)).

[21] *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006).

[22] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

medical care, made applicable in this case to all the Officers due to their knowledge of Thomas's obvious consumption of a large amount of cocaine, the Officers are not entitled to qualified immunity on the claim of failure to render medical care. However, the District Court erred in finding that the failure to intervene claim involved a constitutional violation. We have not recognized a cause of action for such a purported constitutional violation.

## A. Failure to Render Medical Care[23]

### 1. *Violation of the Constitutional Right to Medical Care*

To plead a violation of the right to medical care, an individual must allege (1) "a serious medical need" and (2) "acts or omissions by [individuals] that indicate a deliberate indifference to that need."[24] A serious medical need is "one that has been diagnosed by a physician as requiring treatment

---

[23] As a basic legal standard, the Supreme Court has held that the Eighth Amendment protects a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Because the Fourteenth Amendment affords pretrial detainees protections at least as great as those available to inmates under the Eighth Amendment, we will review Sherelle Thomas's claims for failure to render medical care under the Fourteenth Amendment by applying the same standard used to evaluate claims brought under the Eighth Amendment. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003).

[24] *Natale*, 318 F.3d at 582; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

or one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention."[25] Deliberate indifference is a subjective standard consistent with recklessness.[26] It requires both that an individual be aware of facts from which the inference could be drawn of a substantial risk and that the individual actually draws that inference.[27] In inadequate medical care cases, we have specifically found deliberate indifference where objective evidence of a serious need for care is ignored and where "necessary medical treatment is delayed for non-medical reasons."[28]

We will look to the allegations of the Complaint to determine the adequacy of Sherelle Thomas's pleading of such a violation. She described numerous facts demonstrating a serious medical need. The facts she has alleged support the position that a layperson in the Officers' situation[29] would have been aware both of the danger of cocaine ingestion and of the fact that Thomas had ingested cocaine.

As set forth in the Amended Complaint, Officer Foose's statements to Officers Salazar, Banning, and Carriere, as well as her signed Affidavit of Probable Cause, are sufficient to

---

[25] *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 247–48 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F.Supp. 456, 458 (D.N.J.1979), *aff'd,* 649 F.2d 860 (3d Cir. 1981)).
[26] *Natale*, 318 F.3d at 582.
[27] *Id.*
[28] *Id.* (quoting *Lanzaro*, 834 F.2d at 347).
[29] Qualified immunity is an individual defense so that we independently analyze the conduct of each officer. *Rouse*, 182 F.3d at 200.

11

support the allegation that Officer Foose believed that Thomas ingested cocaine. Her belief was based on multiple observations of Thomas: a large amount of an unknown substance was in his mouth, his lips were pasty white, his face was covered with a white powdery substance, cocaine rocks fell from his shirt, and his candy cigarette explanation was not plausible.[30] She also observed him spit out a "white liquid that resembled crack cocaine attempted (sic) to be swallowed."[31]

The Amended Complaint also alleged that Officers Johnsen, Salazar, Banning, and Carriere and Probation Officer Kinsinger believed that Thomas had ingested a significant quantity of cocaine. A layperson would have known that created a serious medical need. Like Officer Foose, Probation Officer Kinsinger notified another officer of this belief after observing Thomas. Officer Salazar also observed a white powdery substance on Thomas's lips, and both Officers Salazar and Johnsen verbalized their belief that Thomas had ingested cocaine. Officer Banning observed a "large amount of white residue around and on his lips" and found no evidence of candy cigarettes.[32] Moreover, after Officer Carriere was

---

[30] At oral argument, the Officers suggested that Thomas may have consumed a small amount of cocaine and thus there was no serious medical need. However, at this stage, we must accept Sherelle Thomas's pleaded facts and take all inferences in her favor. As a result, we rely on the contention that Thomas consumed a large amount of cocaine, witnessed by various Officers.

[31] Appx. 102.

[32] Appx. 106. *Cf. Watkins v. Battlecreek*, 273 F.3d 682, 686 (6th Cir. 2001) (rejecting claim of serious medical need and deliberate indifference at the summary judgment stage where

notified by the other officers that Thomas had ingested cocaine, Thomas told Officer Carriere that he was overheating despite the cold weather outside, an indication that he was in physical distress and in need of medical attention. In view of the above allegations, the Officers cannot credibly argue that Thomas's denial that he ingested cocaine, taken in the light most favorable to Sherelle Thomas, would negate the conclusion that a layperson would believe that he had, in fact, ingested a significant amount of cocaine and therefore had a serious medical need. Ironically, an arrestee, who consumed drugs for the purpose of concealing them, would probably deny having done so.

Having established objective evidence of a serious medical need, the Amended Complaint alleged facts to support that the Officers were deliberately indifferent to that need. First, each Officer was aware of numerous facts from which one could draw an inference of a substantial risk to Thomas's health. In view of the undisputed evidence of record, the Officers fail in their argument that Thomas's alleged lack of observable symptoms negate the facts from which an inference of a substantial risk to Thomas's health could be drawn.

Second, the Complaint alleges that each Officer actually drew the inference of a substantial risk to Thomas's health. Cocaine ingestion poses an obvious health risk,[33] and the

_____

officers did not witness ingestion and decedent "provided rational explanations for his behavior").

[33] *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) ("A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' And if a risk is well-documented and circumstances suggest

13

Amended Complaint asserts that at least two officers, Corporal Johnsen and Officer Salazar, publicly drew such an inference in the presence of the other Officers, acknowledging that ingestion could lead to an "ill effect" on health or to death.[34] The Complaint alleges adequate circumstantial evidence to suggest that the remaining officers made, or should have made, a similar inference.

Finally, the Complaint alleges that the Officers ignored evidence of this risk and delayed medical care by deciding to book Thomas and by taking him to a booking center that was ill-equipped to handle emergencies. Moreover, this decision was in direct violation of the department policy cited in the Complaint, which states that individuals who have consumed narcotics should be taken to the hospital if the narcotic consumed could jeopardize their health.[35]

---

that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge." (citation omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842–43 (1994))).

[34] Appx. 072–073.

[35] Other police departments have similar policies, demonstrating a broad view of narcotic ingestion as a serious medical need. *See, e.g.*, New York City Police Department, Patrol Guide: Prisoners Requiring Medical/Psychiatric Treatment 5 (Jun. 1, 2016), *available at* https://www.nyc.gov/html/ccrb/downloads/pdf/pg210-04-prisoner-requiring-medical-psychiatric-treatment.pdf ("When a uniformed member of the service observes or suspects that a prisoner has ingested a narcotic or other dangerous substance, the prisoner will be transported from the place of arrest DIRECTLY to the nearest hospital facility . . . UNDER NO

These facts distinguish this case from those the Officers cite in opposition to a holding that there was a constitutional violation. Most of these cases involved officers who demonstrated no actual belief of narcotic ingestion or officers who failed to draw an inference of substantial risk.[36] Because there are sufficient allegations here from which to find deliberate indifference, as well as a serious medical need, Sherelle Thomas has plausibly alleged a violation of the right to medical care.

### 2. *Clearly Established Right*

However, before the Officers can be denied qualified immunity from being sued for deliberate indifference to a serious medical need, the constitutional right violated must be clearly established.[37] In other words, qualified immunity operates "to ensure that before officers are subjected to suit,

---

CIRCUMSTANCES will a prisoner who has ingested a narcotic or other dangerous substance be transported to the command for arrest processing prior to receiving medical treatment.").

[36] *See, e.g.*, *Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d 573, 585 (W.D. Pa. 2011) (rejecting claim on summary judgment where one sole fact, witnessed by one officer, suggested cocaine ingestion and officers requested medical assistance once observing additional signs of overdose); *Watkins*, 273 F.3d at 686 (finding qualified immunity on summary judgment where the evidence did not sufficiently establish that any of the officers believed that the decedent swallowed drugs).

[37] *Saucier v. Katz*, 533 U.S. 194, 201, 206 (2001).

they are on notice their conduct is unlawful."[38]

The District Court properly recognized the "right to medical care for persons in custody of law enforcement."[39] The Supreme Court has established such a right, as have we.[40] There has not yet, however, been a recognition by this Court of the right to medical care after the ingestion of drugs. That then is the issue that we must determine here: Has such a right been clearly established?

The Officers suggest we should articulate the right as follows:

> whether Mr. Thomas had a constitutional right established "beyond debate" to be taken to a hospital emergency room for treatment when none of the officers witnessed him ingest drugs, he repeatedly denied cocaine ingestion even when warned it could cause his death, his companions denied seeing cocaine, he denied experiencing symptoms consistent with cocaine or fentanyl toxicity, he did not request medical care, showed no overt signs of being in medical distress and was taken directly to the prison booking center where he was assessed medically

---

[38] *Id.* at 202, 206 (explaining that a right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

[39] *See* Appx. 030.

[40] *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198, 200 (1989); *Estelle*, 429 U.S. at 103–04; *Natale*, 318 F.3d at 582; *Lanzaro*, 834 F.2d at 347.

16

and cleared by the prison's medical staff to remain.[41]

The law, however, does not require such specificity. Although the Officers are correct that the right must be defined beyond a high level of generality,[42] there need not be "a case directly on point for a right to be clearly established."[43] "'A public official,' after all, 'does not get the benefit of "one liability-free violation" simply because the circumstance of his case is not identical to that of a prior case.'"[44] Instead, the law requires only that the right "is sufficiently clear that a reasonable official would understand that what he is doing violates that right."[45] That standard is met when a violation is "so obvious" it becomes likewise evident that a clearly established right is in play, "even in the absence of closely analogous precedent."[46] As a result, qualified immunity is not appropriate when the case in question presents "extreme circumstances" to which "a general constitutional rule already identified in the decisional law may apply with obvious clarity."[47] That is the case before us.

---

[41] Br. of Appellants Johnsen, Salazar, and Banning 25.

[42] *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

[43] *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

[44] *Mack v. Yost*, 63 F.4th 211, 233 (3d Cir. 2023) (quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 166 (3d Cir. 2021)).

[45] *Id.* at 231 (quoting *Peroza-Benitez*, 994 F.3d at 165); *Pauly*, 580 U.S. at 79–80 (noting that "general statements of the law are not inherently incapable of giving fair and clear warning").

[46] *Mack*, 63 F.4th at 232 (quoting *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011)).

[47] *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Hope v.*

We may rely on general principles to find that the facts here present a violation that is "so obvious" "that every objectively reasonable government official facing the circumstances would know that the [Officers'] conduct. . . violate[d] federal law when [they] acted."[48] In such a case, "general standards can 'clearly establish' the answer, even without a body of relevant case law."[49] In other words, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[50]

As applied to the facts of this case, we hold therefore that when an officer is aware of the oral ingestion of narcotics by an arrestee under circumstances suggesting the amount consumed was sufficiently large that it posed a substantial risk to health or a risk of death, that officer must take reasonable steps to render medical care.[51] In this case, that care would

---

*Pelzer*, 536 U.S. 730, 741 (2002).

[48] *Mack*, 63 F.4th at 232 (quoting *Schneyder*, 653 F.3d at 330).

[49] *Brosseau*, 543 U.S. at 199.

[50] *Hope*, 536 U.S. at 741.

[51] *See DeShaney*, 489 U.S. at 198, 200; *Estelle*, 429 U.S. at 103–04; *Natale*, 318 F.3d at 582; *Lanzaro*, 834 F.2d at 347; *Sandoval v. County of San Diego*, 985 F.3d 657, 680 (9th Cir. 2021) (deriving the right to medical care following the ingestion of narcotics from the general right to medical care); *Reynolds v. Mun. of Norristown*, No. 15-cv-0016, 2019 WL 1429550, at *8–10 (E.D. Pa. Mar. 28, 2019); *de Tavarez v. City of Fitchburg*, 2014 WL 533889, at *4 (D. Mass. Feb. 6, 2014) (holding that it is obvious that the right to medical care requires officers to provide medical care to those who ingested narcotics); *Border v. Trumbull Cnty. Bd. Of Comm'rs*, 414 F.App'x 831, 839 (6th Cir. 2011) (establishing right to medical

18

have been to take the arrestee to a hospital, as provided for in the Harrisburg Police Department policy.[52]

For the above reasons we will affirm the District Court's denial the Officers' claims for qualified immunity.

## B. Failure to Intervene

The Officers contend that the District Court improperly denied their motion to dismiss because (1) Sherelle Thomas cannot adequately plead a violation of failure to intervene to prevent a violation of the right to medical care where no such cause of action exists and (2) there is no clearly established right to intervention in the context of medical care.

The District Court does not directly address whether individuals have a clearly established right to intervention. We agree with the Officers that we have not recognized any such right, nor has the Supreme Court. Though we have recognized a right to have a government actor intervene when the underlying constitutional violation involves excessive force or sexual assault of a person in custody or detention, we have since concluded that our precedent does not establish, let alone clearly establish, a right to intervention in other contexts.[53]

---

care where prisoner showed signs that he was intoxicated).

[52] *See Hope*, 536 U.S. at 741–42 (relying on general principles coupled with Department of Corrections regulations and reports to find that the violation was obvious).

[53] *Weimer v. County of Fayette*, 972 F.3d 177, 190–91 (3d Cir. 2020) (finding that the right to intervene, which exists against uses of excessive force, has not been clearly extended to intervention to prevent unconstitutional investigations); *see*

19

Because there is no clearly established right to intervention in the medical context, we need not address the Officers' contention that Sherelle Thomas has failed to plausibly allege a violation of such a right.[54] [55]

Because there is not a clearly established right to intervention to prevent a violation of the right to medical care, the Officers are entitled to qualified immunity as to Sherelle Thomas's failure to intervene claim.

## IV.    CONCLUSION

For the foregoing reasons, we will affirm in part and

---

*also Ricks v. Shover*, 891 F.3d 468, 479 (3d Cir. 2018) (extending the right to intervention to the "right to be protected by state officials aware of ongoing sexual assault" in a case dealing with a prisoner); *E.D. v. Sharkey*, 928 F.3d 299, 307–08 (3d Cir. 2019) ("agree[ing] that a[n immigration] detainee's right to be protected by state officials aware of ongoing sexual assault was clearly established").

[54] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[55] Because in the process of considering qualified immunity, we have determined that we have not recognized a constitutional duty to intervene to prevent the violation of the right to medical care, we will remand this claim to the District Court with instructions to dismiss it.

Moreover, on the facts here, a claim for failure to intervene would be almost identical to the underlying claim of failure to render medical care:  It would have been virtually impossible for any of the Officers to have had knowledge of an ongoing violation of a right to medical care without themselves participating in that violation.

reverse in part the District Court's order denying qualified immunity.

PHIPPS, *Circuit Judge*, dissenting in part.

I do not believe that it is clearly established that the Due Process Clause of the Fourteenth Amendment imposes a duty on law enforcement officers to transport a detained suspect who ingested drugs to a *hospital*. The Majority Opinion disagrees and holds the transportation-to-a-hospital rule is so obvious that it precludes qualified immunity for the officers who took Thomas to a detention center with medical staff on hand. I respectfully dissent for the reasons below.

The lynchpin of the qualified immunity analysis is not so much the first prong – whether a violation of a federal right has occurred – because that rises and falls with the merits of the action. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (identifying the two prongs and holding that they may be considered in either order). Rather, qualified immunity does most of its work through the second prong – whether the violation of a federal right has been clearly established. *See id.* The mainline method of proving that a right is clearly established at the second prong relies on the notice provided to government officials from the articulation of the constitutional right in question at an appropriate level of specificity by either binding precedent or a robust consensus of persuasive authority. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam); *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). But here, the Majority Opinion offers no precedent for the proposition that as of December 14, 2019, the Due Process Clause required that officers transport to a hospital a detained suspect who appears to have ingested drugs.[1]

---

[1] The most comparable cases involving suspects suffering overdoses are both from the Ninth Circuit and they reached

1

Without any caselaw support, the Majority Opinion resorts to the extraordinary-circumstances exception – an argument not raised by Thomas's Estate. Under the exception, which is available only in "exceedingly rare cases," a federal right may be clearly established for purposes of the second prong even in the absence of controlling precedent or a robust consensus of persuasive authority if the wrongdoing is "so obvious that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002)); *see also Mack v. Yost*, 63 F.4th 211, 233 (3d Cir. 2023).

The Supreme Court has applied the extraordinary circumstances exception very differently than the Majority Opinion now does. In *Hope v. Pelzer*, 536 U.S. 730 (2002), the Supreme Court held that tying a shirtless prisoner to a hitching post in the Alabama sun for seven hours without bathroom breaks and with only one or two offers of water was an obvious violation of the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 734–35. Even without materially similar precedent, the Supreme Court concluded that right was clearly violated due to the "obvious cruelty inherent in th[e] practice." *Id.* at 745. Similarly, in *Taylor v. Riojas*, 141 S. Ct. 52 (2020), the Supreme Court held that "any reasonable officer should have realized" that it was unconstitutional to confine an inmate for six days in two cells – one, which "was covered, nearly floor to ceiling in a massive amount of feces," and another, which was "frigidly cold" and

different outcomes – both after the events of this case. *Compare Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 680–81 (9th Cir. 2021), *with J.K.J. v. City of San Diego*, 42 F.4th 990, 1001 (9th Cir. 2021), *reh'g en banc granted, opinion vacated*, 59 F.4th 1327 (9th Cir. 2023).

required the inmate to sleep naked on a sewage-covered floor. *Id.* at 54 (quotations omitted).

But under the Eighth Amendment standard, which the Majority Opinion applies to the due process claims here, the defendant law enforcement officers did not act with such obvious cruelty. Thomas exhibited no plain symptoms of distress. And he responded coherently to inquiries by other later-arriving officers. The only time he expressed physical discomfort was en route to the booking center, which had on-site medical staff. During that ride, Thomas communicated to the officer that he felt hot and requested the officer to roll down the window despite an outside temperature of forty-six degrees. And after Thomas arrived at the detention center, not even the examining nurse realized the urgency of the situation. Under these circumstances, the response by law enforcement officers – who interacted with Thomas to varying degrees and who are not medical professionals – falls well short of the obvious cruelty alleged in *Hope* and *Taylor*.

Despite invoking the extraordinary circumstances exception, the Majority Opinion does not attempt to construe defendants' conduct as obvious cruelty. Instead, it concludes that a due process violation was obvious based on allegations that the Harrisburg Police Department had "a policy to take an arrestee to the hospital rather than the booking center if they have consumed illegal narcotics in a way that could jeopardize their health and welfare." Am. Compl. ¶ 73 (App. 75). The Majority Opinion relies on those allegations about the policy – not to demonstrate obvious cruelty – but rather to show that defendants were on notice that they should have taken Thomas to a hospital, instead of the detention center, which had medical staff on hand. The extraordinary circumstances exception, however, is not such a broad workaround for the second prong: a municipal policy cannot substitute for controlling precedent or a robust consensus of persuasive authority as a means of providing notice that a constitutional right is clearly established. Moreover, any notice provided by the policy was

not of constitutional dimension – the policy relayed only the Harrisburg Police Department's presumptive action plan under the circumstances, and it lacks force of law. Thus, that policy does not set a constitutional standard of conduct for the Harrisburg Police Department, much less for every law enforcement agency operating within this Circuit's geographical bounds. Such an approach inverts the role of the Constitution as the highest law of the land: constitutional protections should inform police policies; the policy of one police department does not define the constitutional standard of conduct for an entire circuit.

For these reasons, I believe that the Majority Opinion errs in holding that it was clearly established as of December 2019 that law enforcement officers must transport to a hospital a detained suspect appearing to have previously ingested illegal drugs. And here, because the allegations do not identify obvious cruelty, the officers should receive qualified immunity.